1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

TOKIDOKI, LLC, a Limited Liability Company,

Plaintiff,

vs.

FORTUNE DYNAMIC, INC.,

Defendant,

———————————————————

AND RELATED CROSS ACTION

———————————————————

) CASE NO. CV 07-1923 DSF (PJWx)
)
) FINDINGS OF FACT AND
) CONCLUSIONS OF LAW AFTER
) COURT TRIAL
)
)
)
)
)
)
)
)
)
)

    This matter was tried before this Court, sitting without a jury, on October 8, October 10, October 21, October 22, and October 23, 2008.  Alejandro P. Gutierrez of Hathaway, Perrett, Webster, Powers, Chrisman & Gutierrez and Andrew Kent appeared on behalf of Plaintiff, Tokidoki, LLC.  James C. Fedalen and Angela Lin of Huang, Fedalen & Lin, appeared on behalf of Defendant Fortune Dynamic, Inc.

    Having heard the admissible evidence presented by the parties, the arguments of counsel, and the supplemental briefing, and having considered the demeanor and credibility of the witnesses and all papers and exhibits presented by the parties for purposes of this trial, including admissions in the Pretrial Order, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I.  FINDINGS OF FACT

### A.      Preliminary Facts

1.      Tokidoki, LLC is a California Limited Liability Company established on October 3, 2003 by its three members: Pooneh Mohajer-Shojaee, Ivan L. Arnold, and Simone Legno.

2.      Fortune Dynamic, Inc. ("Fortune") is a California corporation established in 1987, in good standing.

3.      Tokidoki's First Amended Complaint asserts claims against Fortune for: (1) Trademark Infringement (15 U.S.C. § 1114); (2) Copyright Infringement (17 U.S.C. § 501); (3) Federal Unfair Competition (15 U.S.C. § 1125(a)); (4) California Unfair Competition (Cal. Bus. & Prof. Code §§ 17200, et seq.); (5) False Advertising (Cal. Bus. & Prof. Code §§ 17500, et seq.); (6) Federal Trademark Dilution (15 U.S.C. § 1125(c)); and (7) violation of California Business & Professions Code § 14330.

4.      Fortune has asserted a single counterclaim for cancellation of Registration No. 3030306 ("Trademark Reg. No. '306" or "Reg. No. '306"), issued to Tokidoki on December 13, 2005 by the United States Patent & Trademark Office (the "USPTO").

5.      The Court has also tried the following affirmative defenses: Fortune's Third Affirmative Defense, alleging the Tokidoki mark, consisting of a heart above two crossed bones ("Heart and Crossbones," "Tokidoki Mark" or the "Mark") is generic; Fortune's Seventh Affirmative Defense, alleging it used the single heart and crossbones design in good faith and without knowledge of Tokidoki's Mark; Fortune's Eighth Affirmative Defense, alleging that Fortune independently created the allegedly infringing designs; and Fortune's Eleventh Affirmative Defense, alleging the '306 Registration was fraudulently procured. Fortune withdrew its remaining affirmative defenses before trial.

### B.      Tokidoki's Trademark Application

6.    On January 12, 2004, Tokidoki filed a Trademark Application, Serial No. 78350903, in the USPTO for registration of the Mark, stating that it had a bona fide intention to use the Mark on clothing, hair clips, and wallets.

7.    On October 14, 2004, Tokidoki amended its trademark application by filing a Response to Office Action in the USPTO that identified the goods on or in connection with which Tokidoki intended to use the Mark as: Class 025 "Men's, women's and children's clothing; namely, shirts, T-shirts, sweatshirts, tank top, vests, dickies, blouses, coats, jackets, sweaters, sweatshirts, pullovers, skirts, dresses, pants, sweat pants, shorts, beach wear, swimwear, belts, hats, caps, visors and footwear," Class 018 "Wallets," and Class 026 "Hair clips."

8.    In a Notice of Allowance with an Issue Date of April 5, 2005, the USPTO advised Tokidoki that Tokidoki was required to use the Mark in commerce and file a Statement of Use before the USPTO would register the Mark; that Tokidoki had six months from the Issue Date to either file a Statement of Use or an Extension Request; and that the goods with respect to which the Notice of Allowance pertained, by International Class, were: "018 - Wallets;" "025 - "Men's, women's and children's clothing; namely, shirts, T-shirts, sweatshirts, tank top, vests, dickies, blouses, coats, jackets, sweaters, sweatshirts, pullovers, skirts, dresses, pants, sweat pants, shorts, beach wear, swimwear, belts, hats, caps and visors; and footwear;" and "026 - Hair clips."

9.    On September 29, 2005, Tokidoki filed a Statement of Use in the USPTO, in which it stated, with respect to International Class 018, International Class 025, and International Class 026 that "the applicant or the applicant's related company or licensee, is using the mark in commerce on or in connection with all goods and/or services listed in the application or Notice of Allowance."

10.    The Statement of Use that Tokidoki filed was supported by a Declaration signed by Tokidoki's attorney, Thomas Philbrick, who was properly authorized to sign on behalf of Tokidoki, and stated:

> The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that

he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true.

11.     Tokidoki member Ivan Arnold, who handled Tokidoki's sales and licensing, managed Tokidoki's website, and reviewed and approved Tokidoki's catalogs, worked with Philbrick in connection with obtaining a trademark registration for the heart and crossbones image.  On September 29, 2005, Arnold, who knew what Tokidoki products were being sold and knew what products Tokidoki had identified in its October 14, 2004 Response to Office Action, communicated via email with Philbrick regarding the Statement of Use and saw the Statement of Use before it was filed.

12.     Tokidoki's representation in its Statement of Use that it was using the Mark in commerce on or in connection with all of the goods listed in the Notice of Allowance was false and was known by Tokidoki to be false at the time the Statement of Use was filed.  The only goods in Class 18, 25, and 26 on or in connection with which Tokidoki was actually using the Mark in commerce at that time were t-shirts, shirts, and belts.

13.     Having observed the demeanor of the witness and considered the testimony in this trial, the Court finds the following testimony of Arnold was not credible:

(a)  that Philbrick[1] was not authorized to file the Statement of Use.  This testimony was not credible, as it was contradicted by Arnold's testimony that he worked with Philbrick in connection with obtaining a trademark registration for the heart and crossbones image; that on September 29, 2005,  Arnold communicated via email with Philbrick regarding the Statement of Use before Philbrick filed it; that on September 29, 2005, Arnold knew what products Tokidoki had identified in its October 14, 2004 Response to Office Action; that Arnold saw the Statement of Use before it was filed; and that Arnold did not tell Philbrick not to file the Statement of Use;

(b)  that when Tokidoki filed its Statement of Use stating that "the

---

[1]  Philbrick did not testify.

4

applicant or the applicant's related company or licensee, is using the mark in commerce on or in connection with all goods and/or services listed in the application or Notice of Allowance," Arnold was not aware that the statement "just had to apply to the United States" and "thought that if [Tokidoki] were engaged in making products that were designed in the United States, that would sufficiently qualify as being acceptable." This testimony was not credible, in that Arnold's testimony reflects that many of the goods listed in Tokidoki's application, as amended by the October 14, 2004 Response to Office Action, including, but not limited to, vests, dickies, blouses, pullovers, dresses, sweatpants, shorts, and caps, were not being sold anywhere in the world.

14.    On December 13, 2005, the USPTO issued Reg. No. '306 to Tokidoki for the Mark for all goods on or in connection with which Tokidoki, in its Statement of Use, had represented that it was using the Mark in commerce. Tokidoki is also the owner of additional registrations and applications for registration (such as Registration No. 3249536, for the Heart and Crossbones logo in International Classes 14 and 18, and Registration No. 3030128, in International Class 25 for the composite trademark consisting of the Heart and Crossbones logo alongside the word "Tokidoki").

15.    Tokidoki did not use the Mark in commerce on or in connection with any goods in Class 025, other than t-shirts, shirts, and belts, until Spring/Summer of 2006, when it began using the Mark for sweatshirts and knitwear. Tokidoki began using the Mark for hats and caps in the Fall of 2006. The Mark was not used in commerce in connection with footwear until Spring/Summer 2007, when "tokidoki for Fornarina" shoes were first offered for sale.

16.    On May 16, 2007, in the action for alleged infringement that Tokidoki filed against H&M Hennes & Mauritz, L.P. ("H&M"), H&M filed a counterclaim for cancellation of Trademark Reg. No. '306, alleging that Tokidoki had fraudulently procured the registration.

17.     As a result of H&M's counterclaim, Tokidoki filed a June 27, 2007 Post-Registration Amendment in the USPTO, to reduce from 24 to 3 the goods in Class 025 on or in connection with which it had been using the Mark.

## C.     Tokidoki's Copyright Registration

18.     Before trial, Tokidoki represented to Fortune and to this Court that the copyrighted work for which Copyright Registration No. VA-1-353-059 was issued was the heart and crossbones design.  This representation was not true, as Arnold testified at trial that Copyright Registration No. VA-1-353-059 was issued for the graphic works in Tokidoki's Fall 2005 catalog, which was a compilation of products bearing numerous designs, including a single heart and crossbones design.

19.     Tokidoki has obtained 100 copyright registrations.  Tokidoki not only obtains copyright registrations for all of its catalogs, but also obtains individual copyright registrations for Tokidoki "characters" that appear on products shown in Tokidoki's catalogs.  For example, by the end of  2005, Tokidoki had separately obtained copyright registrations for each of the following Tokidoki "characters": Tigrotto, soccer bunny, Adios star, Cactus girl, Latte, Mozzarella, Nana star, mint girl, Mou Mou 2, Bastardino, Diavoletti, Fantasmino, baby Mou Mou, and Camo & Adios.  From 2006 to the present, Tokidoki has obtained individual copyright registrations on many more Tokidoki "characters."  However, Tokidoki did not obtain a copyright registration for its heart above crossbones design.

20.     In Section 1 of the Copyright Registration, Tokidoki represented that Simone Legno was the author of the copyrighted work and that Tokidoki owned the copyright by assignment from Legno.  This representation was false.  While Legno was the author of the heart and crossbones design, having created it before Tokidoki came into existence, he was not the author of Tokidoki's Fall 2005 Catalog, the actual "work" for which the copyright registration was issued.  As the catalog was compiled and created by Tokidoki, the registration should have reflected that Tokidoki was both the owner and author of the copyrighted work, not an assignee. Moreover, as Legno was not the author of Tokidoki's Fall 2005

6

Catalog, he had no assignable or transferable property interest in the catalog and, therefore, could not assign or transfer any right in it to Tokidoki.

21.   Arnold's testimony that his wife,[2] at 1:00 a.m. on the fourth day of trial, suddenly located in Tokidoki's files the written agreement in which Legno assigned to Tokidoki his intellectual property rights in the heart above crossbones image was not credible, in light of:

(a)  Tokidoki's representation, in its supplemental response to Fortune's request for production, that it did not have any assignment agreements related to the subject trademark and copyrighted work;

(b)  Arnold's testimony that he and his wife were previously unable to locate the assignment agreement despite making inquiries to their attorneys and spending a lot of time going through Tokidoki's records;

(c)  Arnold's testimony that the assignment agreement was negotiated and drafted by attorneys representing the Arnolds and Legno and was relied on by Tokidoki's attorney when Tokidoki applied for the copyright registration that Fortune is accused of infringing.

Plaintiff asserted that neither the Arnolds, nor Legno, nor the attorneys who had supposedly negotiated the assignment agreement on behalf of the Arnolds and Legno, nor the attorney who supposedly relied on the assignment agreement in applying for copyright registration of Tokidoki's Fall 2005 catalog, had been able to locate a copy of the agreement until the fourth day of trial.  (At that point it had become clear that Fortune was challenging Tokidoki's right to pursue a copyright claim when there appeared to be no written assignment of Legno's heart and crossbones design.)  This assertion is not credible.

22.   The following testimony of Michael M. Baranov, whom Tokidoki brought to court the day after Arnold testified that his wife had just found the assignment agreement, was not credible:

[2]   His wife, Mohajer-Shojaee, did not testify.

(a)  that Baranov had maintained the assignment agreement in Tokidoki, LLC's records from the time the LLC was created.  This testimony was not credible, in that both Arnold and Baranov testified that  Baranov had been asked to provide documents responsive to Fortune's discovery requests, and yet, Tokidoki had represented in its supplemental responses to Fortune's request for production of assignment agreements related to copyrights or trademarks, that Tokidoki had no documents responsive to the request;

(b)  that the assignment agreement was executed concurrently with Tokidoki's Operating Agreement, on or around October 3, 2003.  This testimony was not credible, in light of Baranov's inability to explain: (a) why the integration provision in the Operating Agreement, which he drafted, identifies *only* the "Operating Agreement" and the "Buy-Sell Agreement" and explicitly excludes all other agreements – *ostensibly including the assignment agreement*– declaring that all other agreements "have no force or effect" and (b) why an exhibit to the assignment agreement contained an image of the heart above crossbones design with a conspicuous ® symbol, when the Mark was not registered until December 13, 2005 – more than two years after the purported execution of the assignment agreement.

23.     There was no evidence that Fortune had reasonable access to Tokidoki's Fall 2005 catalog nor any evidence to support an inference of access. In 2005, Tokidoki goods were limited to t-shirts, shirts, and belts.  As Fortune only sells shoes, it had no reason to seek access to a Tokidoki catalog.  Further, Tokidoki's catalog was only distributed to Tokidoki's licensees and retail customers at trade shows.  Fortune did not attend the same trade shows as Tokidoki and has never done business with Tokidoki or with anyone who had a business relationship with Tokidoki.

24.     Fortune's print design with <u>two</u> hearts and crossed drumsticks was less similar to Tokidoki's single heart above crossbones design than the designs with one heart superimposed over crossbones (as opposed to being above the crossbones) that Arnold testified were not substantially similar to Tokidoki's heart

8

above crossbones design and would not concern Tokidoki (i.e., cause it to send a cease and desist letter).

### D.   The Use of Heart and Crossbones Designs by Third Parties

25.   Between April 14, 2006, and May 16, 2007, Tokidoki sent cease and desist letters to at least 15 companies regarding their use of heart and crossbones designs on goods.  All but one of those companies was using a single heart above crossbones design similar to the Mark.  One had used a single heart above crossed arrows design.  Tokidoki filed suit against at least four of those companies, including Fortune.

26.   Since May 16, 2007, Tokidoki has sent cease and desist letters to approximately 20 more companies regarding their use of a single heart above crossbones design on goods.

27.   Tokidoki actually labels its products with a different registered mark– Reg. No. 3,030,128 – which consists of the heart above crossbones design in conjunction with the word "tokidoki."  See Minute Order granting Judicial Notice of Trademark Principal Register Certificate for Registration No. 3,030,128 (Doc 225).  To indicate their affiliation with Tokidoki, its licensees also use the mark that includes the word "tokidoki" on or in connection with the products they produce pursuant to their licensing agreements.

### E.   Fortune's Creation of the Allegedly Infringing Print Designs

28.   Fortune has been a designer, importer, and wholesaler of footwear for women and children since 1987.  Fortune markets and sells its shoe styles to independent shoe retailers under its registered brand names, which include: PAPRIKA®, SODA®, DELICIOUS® and LEMON TREE®.

29.   On August 7, 2006, Fortune's President, Carol Lee, purchased a Punkrose brand shoe style decorated with the repeating print design of a star above crossbones.  Fortune liked the print design on the Punkrose shoe for use on a similarly designed SODA® brand shoe, but did not want to copy the Punkrose print design.  Corey Lutz, Fortune's Vice President of product development and marketing, suggested that the star in the print design be changed.  Lee decided to

change the star to a heart.  On August 14, 2006, Fortune line-builder Dan Marcott sent the Punkrose shoe to Fortune's manufacturer with a sample request ("SR") form requesting the manufacture of a sample SODA® Leroy-S shoe style ornamented with a print design based on the Punkrose shoe.  The dated sample request form identified the "Original Sample" as "Punkrose ON 936/936S" and instructed the manufacturer: "Please do with red hearts instead of stars.  Heart size same as star on original."

30.     Lee and her design staff had not heard of Tokidoki nor seen its heart and crossbones design/Mark in August of 2006 and did not learn of either until January 29, 2007.[3]

31.     After receiving the Leroy-S sample shoe with the single heart above crossbones print design from its manufacturer, Fortune placed its first manufacturing order for the women's shoe (Leroy-S) decorated with the print design on or about August 31, 2006.

32.     Fortune's second and final order for the women's shoe with the single heart above crossbones print design was placed on or about November 17, 2006.  Fortune placed its only manufacturing order for the children's version (Leroy-IIS) on or about October 13, 2006.

33.     On January 29, 2007, Fortune received a cease and desist letter dated January 25, 2007 from counsel for Tokidoki.  It was from Tokidoki's cease and desist letter that Fortune first learned that Tokidoki existed and that it had been issued a trademark for the image of a single heart above crossbones.

34.     The Court found the witnesses whose testimony is described in the preceding paragraphs to be credible and concludes that they had no knowledge of Tokidoki.  Therefore, Fortune did not use the heart and crossbones design with the intent to palm off its shoes as Tokidoki's, to capitalize on Tokidoki's reputation or good will, or to mislead or deceive the public.  Moreover, the shoes on which

---

[3]   The Court agrees with Fortune that Tokidoki's use of the Rule 45 trial subpoena to Richard Harbaugh was improper.  Even if the Court were to consider the evidence and testimony of Harbaugh, however, its decision would be the same.

Fortune used its heart and crossbones print design were clearly labeled with the SODA® brand name.

35.     Nevertheless, after receiving Tokidoki's cease and desist letter, Fortune decided not to place any new orders for shoes decorated with the single heart above crossbones print design and did not fill any new orders with shoes decorated with that print design.

36.     After receiving Tokidoki's cease and desist letter, Fortune fulfilled prior commitments it had made, by shipping shoes with the single heart above crossbones print design to customers whose orders had been received and accepted by Fortune before January 29, 2007.  Fortune did not accept new orders for the single heart design.  In shipping the previously ordered shoes, Fortune intended to honor its prior commitments to its customers and was not attempting to capitalize on Tokidoki's reputation or good will or to palm off its clearly labeled SODA® brand shoes as Tokidoki's goods, or to mislead or deceive.

37.   Tokidoki did not use the Mark in commerce in connection with shoes until it advertised its collaboration with Fornarina ("tokidoki for Fornarina") in the Tokidoki Spring/Summer 2007 catalog.

38.     Shortly after receiving Tokidoki's cease and desist letter, Fortune modified its single heart above crossbones print design by adding a second heart and changing the crossbones to crossed drumsticks (the "double heart and crossed drumsticks design").  Fortune modified its previous design for the specific purpose and with the specific intention of avoiding further accusations of infringement from Tokidoki, as Fortune believed that the double heart and crossed drumsticks design did not infringe Tokidoki's Mark.

39.     Fortune offered to its customers the double heart and crossed drumsticks design on SODA® brand Ash-II , Joey, Leroy, Leroy-S and Go shoe styles from late March or early April of 2007 to September of 2007.  The shoes were clearly labeled with the SODA® brand name.

**F.     Facts Related to the Issue of Likelihood of Confusion**.

40.    Fortune's only products are footwear.  Tokidoki products include toys, skate decks, posters, pins, badges, stationery, watches, jewelry, hats, t-shirts, shirts, jackets, and hoodies.  For a period of time in 2007, "tokidoki for Fornarina" brand shoes were shown in Tokidoki's catalog and were sold in shoe stores and department stores.

41.    Fortune's shoes are not sold in the same stores that sell Tokidoki's products and are not sold by any of Tokidoki's licensees.  Fortune's shoes are sold in low-end retail stores, such as Wet Seal, Windsor Fashion, Reflected Shoes, Shoe Carnival, Charlotte Russe, Journeys, and Wal-Mart in Canada.  Products with the "tokidoki" brand are sold in high-end department stores (e.g., Bloomingdale's, Macy's, Nordstrom's, and Barney's), boutiques, specialty stores, and on the Tokidoki website.

42.    The price differential between Tokidoki's products and Fortune's is substantial.  The retail price for a pair of Fortune's SODA® brand shoes is between $10 and $15.  The retail price for a pair of "tokidoki for Fornarina" shoes was more than $60, and the price of the Tokidoki brand "Tiger" shoe that was released in 2008 is approximately $120.

43.    All products sold by or affiliated with Tokidoki bear the name "tokidoki."  All of Fortune's shoes bear one of Fortune's brand names (e.g., CLASSIFIED®, SODA®, PAPRIKA®, DELICIOUS®) or the brand name of a Fortune "private label" customer.

44.    Fortune has never negotiated or done business with Tokidoki or with anyone who knew Tokidoki, has never sold its products in a store that sold Tokidoki's products, and has never used suppliers or vendors who did business with Tokidoki.

45.    Use of single heart above crossbones designs by sellers of apparel and footwear has been and still is widespread in the United States.

46.    There is no evidence of actual confusion as to the source or affiliation of Fortune's shoes with either the single heart or double heart print design.

12

47.     The survey conducted by Tokidoki's expert witness, Dr. Bruce R.
Isaacson, does not establish that consumers were likely to be confused as to the
source or affiliation of Fortune's shoes with either the single heart or double heart
print design.  The survey was seriously flawed, in that:

(a)  The survey was so leading and unrealistic that it did not measure any
likelihood of real world confusion.  Dr. Isaacson's survey was essentially an
artificial matching game in which respondents were shown two products in
succession and asked whether those two products were somehow connected.
Survey participants were shown (1) a Tokidoki hat or t-shirt bearing only a heart
above crossbones design and (2) a SODA® shoe decorated with either the single
heart and crossbones design, the double heart and crossed drumsticks design, a
paisley design, or a cherry design.  By contrast, the fair and non-leading way in
which experts now conduct this type of survey is to show the plaintiff's and
defendant's product in the context of a number of products about which they
would be questioned.  This removes the spotlight from the products of the plaintiff
and defendant, helps avoid making obvious what the survey is about, and makes
the survey more realistic and less leading.

(b)  The "control" chosen was inadequate to screen out the high levels of
"noise" expected from a survey that is so leading.  A control should be as close to
the allegedly infringing design as possible without itself being infringing, so that
one can accurately gauge the noise level – the people who are prone to guessing or
yea-saying.  The paisley and cherry print designs that Dr. Isaacson used as
"controls" were so different from the heart and crossbones design that their use
could only have picked up some of the noise, not all of it.

 (c)  The leading nature and lack of realism of Dr. Isaacson's survey was
exacerbated by his use of Tokidoki products that were very atypical (decorated
only with a heart and crossbones image and none of the colorful Japanese-inspired
artwork and characters typically found on Tokidoki products) and did not give the
respondents the kind of exposure to Tokidoki that they would have if exposed to
Tokidoki products in the real world.

(d)  The instructions and screening questions emphasized to respondents a connection between the shoes and hats and t-shirts that would have tended to bias the respondents to assume that the products probably were coming from the same or related companies.

(e)  There were defects in the "universe" (consumers whose opinion would be relevant to the survey) that was used for the survey.  By requiring that a survey participant be a potential purchaser of both Tokidoki's and Fortune's products, Dr. Isaacson excluded a significant portion of the relevant universe – people who would only be Fortune's customers.  Also, Dr. Isaacson's focus on geographic regions in which Tokidoki's sales are greatest was also inappropriate.

**G.   Tokidoki Suffered No Injury in Fact, No Loss of Money or Property, and No Damages,  Lost Sales or Royalties Due to Fortune's Acts.**

48.     Tokidoki did not lose sales due to sales of Fortune's shoes decorated with the single heart and crossbones print design or the double heart and crossed drumsticks print design.  Moreover, Tokidoki agreed, in writing, that it would not pursue lost profits damages in this action.

49.     Tokidoki did not lose royalties due to Fortune's actions.

50.     There is no evidence that Fortune's use of the single heart above crossbones design or the double heart and crossed drumsticks design diluted or was likely to dilute the value or strength of Tokidoki's Mark.  Furthermore, in light of the widespread use of similar designs in commerce by others, it cannot be established with any degree of certainty that dilution or likelihood of dilution, if any, was the result of Fortune's use of a similar mark.  In any event, Tokidoki admitted that it has no evidence of likelihood of dilution.

51.     Given the widespread use of the heart above crossbones design, it cannot be established with any degree of certainty that the famousness of that design, if any, was the direct result of Tokidoki's use of it, and there is no evidence tending to show that the consuming public associates the single heart above crossbones design exclusively with Tokidoki.

14

52.     There has never been a licensing relationship or any relationship whatsoever between Tokidoki and Fortune.

53.     Before 2007, Tokidoki granted licenses to others to use its artwork, which, as now, consisted of Japanese-inspired cartoon-like images of people, animals, and fantasy characters, as depicted in Exhibit Nos. 256, 257, and 102. Under its various license agreements, Tokidoki's licensees were provided with custom portfolios of artwork, use of multiple designs, the right to consult with Tokidoki regarding development of their products, and, in some cases, promotional appearances by Legno.  There was no evidence of any agreement in which Tokidoki only licensed use of the heart and crossbones design.  Moreover, Mr. Arnold testified that Tokidoki does not – and would not – license "the heart and crossbones by itself."  Thus, it cannot be established with reasonable certainty that royalties were lost, much less the amount of the claimed loss.  Further, Tokidoki did not offer expert testimony or opinion regarding what a reasonable royalty rate should have been had Tokidoki been willing to license use of the single heart over crossbones design to a third party.

54.     Tokidoki did not suffer any injury as a result of Fortune's conduct.

55.     Fortune did not take from Tokidoki any money or property that Tokidoki once owned or possessed.

56.     Fortune stopped selling shoes decorated with the allegedly infringing print designs in 2007 and does not intend to use either print design again.

## II.   CONCLUSIONS OF LAW

### A.   Burden of Proof

1.     Tokidoki was required to establish, by a preponderance of the evidence, every element of its claims for trademark infringement, federal unfair competition, federal trademark dilution, federal copyright infringement, California unfair competition, and California false advertising.  See In re Exxon Valdez, 270 F.3d 1215, 1232 (9th Cir. 2001) ("The standard of proof generally applied in federal civil cases is preponderance of evidence.").

2.      Fortune was required to establish by clear and convincing evidence its fraudulent procurement defense.  <u>Metro Traffic Control, Inc. v. Shadow Network, Inc.</u>, 104 F.3d 336, 340 (Fed. Cir. 1997).

## B.      <u>Fraudulent Procurement of Trademark</u>

3.      "Cancellation of [a trademark] registration is proper when (1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing."  <u>Star-Kist Foods, Inc. v. P.J. Rhodes & Co.</u>, 222 U.S.P.Q. 674, 675 (9th Cir. 1984) (internal quotation marks omitted).

4.      A petition to cancel a registration of a mark may be filed by any person who believes that he is or will be damaged by the registration of a mark." <u>Id.</u> at 676.  "Such a filing can be made at any time if the . . . registration [of the mark] was obtained fraudulently."  <u>Id.</u> (internal quotation marks omitted).  The party seeking cancellation need not prove damages to establish standing.  <u>Id.</u>  But there must be a "real controversy between the parties."  <u>Id.</u>  "A party may seek cancellation of a registered trademark on the basis of fraud . . . by proving [(1)] a false representation regarding a material fact, [(2)] the registrant's knowledge or belief that the representation is false, [(3)] the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and [(4)] damages proximately resulting from the reliance."  <u>Robi v. Five Platters, Inc.</u>, 918 F.2d 1439, 1444 (9th Cir. 1990).  The petitioner has a heavy burden in showing that a party fraudulently procured a trademark registration.  <u>Id.</u>  "Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or no room for speculation or surmise . . . and any doubts resolved against [the] charging party."  <u>Yocum v. Covington</u>, 216 U.S.P.Q. 210, 216 (TTAB 1982).

5.      A registrant is "obligated to confirm the meaning and accuracy of the statements contained in the application before signing the declaration and prior to the submission to the USPTO."  <u>Hachette Filipacchi Presse v. Elle Belle LLC</u>, 85 U.S.P.Q.2d 1090, 1094 (TTAB 2007).  The "USPTO will not issue a registration covering goods upon which the mark has not been used."  <u>Medinol Ltd. v. Neuro</u>

16

VASX, Inc., 67 U.S.P.Q.2d 1205, 1208 (TTAB 2003).  Therefore, "[s]tatements regarding the use of the mark on the identified goods . . . are certainly material to issuance of a registration."  Herbaceuticals, Inc. v. Xel Herbaceuticals, 86 U.S.P.Q. 2d 1572, 1576 (TTAB 2008).

6.      The party seeking cancellation must show "the registrant's knowledge or belief that the representation is false[.]"  Robi, 918 F.2d at 1444. "Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application."  Quicksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006) (internal quotation marks omitted).

7.      "[A]n applicant or registrant may not make a statement he/she knew or should have known was false or misleading."  Hachette Filipacchi Presse, 85 U.S.P.Q.2d at 1094 (emphasis added).  The "appropriate inquiry is . . . not into the registrant's subjective intent, but rather into the objective manifestations of that intent."  Medinol, 67 U.S.P.Q.2d at 1209.  "[P]roof of specific intent to commit fraud is not required, rather, fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false[.]"  Id. (internal quotation marks omitted); see also Torres v. Cantine Torresella, S.r.l., 808 F.2d 46, 49 (Fed. Cir. 1986) (If "a registrant files a verified renewal application stating that his registered mark is currently in use in interstate commerce and that the label attached to the application shows the mark as currently used when, in fact, he knows or should know that he is not using the mark as registered . . . , he has knowingly attempted to mislead the [US]PTO.") (emphasis added).

8.      Therefore, Fortune has shown that Tokidoki knowingly made a false representation to the USPTO by establishing that Tokidoki should have known

that the representation was false.[4]   In any event, the Court finds Arnold knew the representation was false.

9.   Arnold testified to the effect that there was some kind of miscommunication with Philbrick resulting in the false statements.  The Court did not find this testimony credible.  Therefore, the Court finds Tokidoki misrepresented facts to the PTO concerning the extent of its use of the mark in its Statement of Use.  These facts were material to the PTO.  Medinol, 67 U.S.P.Q.2d at 1208 ("the statement of use would not have been accepted nor would registration have issued but for [the applicant's] misrepresentation, since the USPTO will not issue a registration covering goods upon which the mark has not been used").  Tokidoki's false representation was made to induce the PTO to rely upon it.  See Trademark Rule 2.88 (c).[5]

---

[4]   The standard that the Court adopts is consistent with the principle that it is "extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief."  Woodstock's Enters. Inc. (California) v. Woodstock's Enters. Inc. (Oregon), 43 U.S.P.Q.2d 1440, 1444 (TTAB 1997).  A material representation that the registrant should have known was false is, by definition, not a statement "made with a *reasonable* . . . belief" in its truth.  Id. at 1443 (emphasis added).  See also Standard Knitting, 2006 WL 173463 at *12 (finding that the applicant's "asserted mistake, assuming it truly was a mistake, was not a reasonable one"), and Maids to Order of Ohio, Inc. v. Maid-to-Order Inc., 78 U.S.P.Q.2d 1899, 1906 (TTAB 2006) ("If [the registrant] had a reasonable . . . basis for the representations, then [the registrant] has not committed fraud.").
      Also, Tokidoki's reliance on Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1158-60 (9th Cir. 2001), is misplaced.  In Chance, the Ninth Circuit adopted the totality of circumstances test in the context of determining the "priority of use" of a service mark.  Id.

[5]   Trademark Rule 2.88 (c) provides:
                    "[T]he statement of use may be filed only when the
                    applicant has made use of the mark in commerce on or in
                    connection with all of the goods or services, as specified in
                    the notice of allowance, for which applicant will seek
                    registration in that application, unless the  statement of use
                    is accompanied by a request in accordance with
                    § 2.87 to divide out from the application the goods or
                    services to which the statement of use pertains."

18

10.     The PTO "relies on the thoroughness, accuracy and honesty of each applicant."  <u>Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha</u>, 77 U.S.P.Q.2d 1917, 2006 WL 173463 at *13 n.14 (TTAB 2006).  The PTO relied on the representations of Tokidoki in the Statement of Use by issuing Trademark Registration Certificate No. 3030306.  15 U.S.C. § 1051(d).[6]  As representations in the Statement of Use were required to be made under oath, Tokidoki had the legal duty to "confirm the meaning and accuracy of the statements contained" in the Statement of Use before its submission to the PTO.  <u>Hachette Fillipacchi Presse</u>, 85 U.S.P.Q.2d at 1094; <u>see also</u> <u>Hurley International LLC v. Volta</u>, 82 U.S.P.Q.2d 1339, 1345 (TTAB. 2007) (applicants were "under an obligation to investigate thoroughly the validity" of their belief that their use of the mark in another country was sufficient for registration in the United States).  Thus, at the very least, Tokidoki should have known that the representations in its Statement of Use were false, as it knew at that time what the true facts were.  <u>Torres</u>, 808 F.2d at 49 (summary judgment cancelling trademark registration affirmed where registrant "knew or should have known" that statements in renewal application were false).[7]

---

[6]  15 U.S.C. § 1051(d) provides, in pertinent part:
> Within six months after the date on which the notice of allowance with respect to a mark is issued . . . , the applicant shall file in the Patent and Trademark Office . . . a verified statement that the mark is in use in commerce and specifying . . . those goods or services specified in the notice of allowance on or in connection with which the mark is used in commerce.  Subject to examination and acceptance of the statement of use, the mark shall be registered in the Patent and Trademark Office, a certificate of registration shall be issued for those goods or services recited in the statement of use for which the mark is entitled to registration . . . .  The notice of registration shall specify the goods or services for which the mark is registered.

[7]  A lack of subjective intent to defraud the USPTO into granting a broader registration than is warranted is not a defense.  To the contrary, "specific or actual intent . . . is not material to the question of fraud."  <u>Standard Knitting</u>, 77 U.S.P.Q.2d 1917, 2006 WL

11.     The evidence shows that Arnold was the member of Tokidoki, LLC who was working with Tokidoki's attorney in connection with obtaining a trademark registration for the heart and crossbones image; that Arnold knew on September 29, 2005, that the only goods in Class 18, 25, and 26 that Tokidoki was selling in the United States were t-shirts, shirts and belts;[8] and that on September 29, 2005, Arnold saw and communicated via email with Tokidoki's attorney regarding the Statement of Use before Tokidoki's attorney filed it.  From the foregoing, the Court concludes that Fortune established by clear and convincing evidence that the misrepresentations in the Statement of Use filed by Tokidoki were intentional and constituted fraud upon the PTO.  Medinol, 67 U.S.P.Q.2d at 1209 ("A trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false or misleading").

12.     Fortune is damaged by Tokidoki's fraud in the procurement of its registration of the mark, in that Fortune was required to expend substantial sums to defend itself against Tokidoki's claim for trademark infringement.  See Trademark Trial and Appeal Board Manual of Procedure ("TBM") § 303.03 (as used in 15 U.S.C. § 1064, the term "damage" concerns a party's standing to petition to cancel a trademark registration, and may be established by a showing that the party has a personal interest in the outcome of the proceeding and a reasonable basis for its belief in damage).

---

173463 at *13.  The question the USPTO asks is whether the registrant **knew or should have known** that it was making a misstatement in a filing before the Office.  Medinol, 67 U.S.P.Q.2d at 1209.  In any event, the Court finds that Arnold's testimony concerning his "mistake" was not credible.

[8]   The Court finds that Tokidoki's activities with respect to goods in Class 18 and 26 prior to Tokidoki's submission of the Statement of Use regarding the No. 3030306 registration to the USPTO on September 29, 2005 are not sufficiently "clear and unmistakable" as to constitute use in commerce of the Mark supporting registration.  See Pennwalt Corp. v. Sentry Chem. Co., 219 U.S.P.Q. 542, 550-51 (TTAB 1983).  It was not reasonable for Tokidoki to rely on such activities in its application for registration.  See id.

13.     Tokidoki failed to establish its "acquiescence" affirmative defense to Fortune's counterclaim.  To establish this affirmative defense, Tokidoki had to prove that: (1) Fortune engaged in conduct that expressly or impliedly assured Tokidoki that Fortune would not pursue a counterclaim for cancellation; (2) the delay between Fortune's active representation and its assertion of the counterclaim was not excusable; and (3) Fortune's delay caused Tokidoki undue prejudice. Acquiescence implies intentional behavior.  "Laches is a negligent and unintentional failure to protect one's rights while acquiescence is intentional." See Elvis Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991).  However, Tokidoki failed to point to any intentional behavior by Fortune that communicated to Tokidoki that Fortune would not pursue a counterclaim for cancellation.

14.     By reason of Tokidoki's fraud in the procurement of Trademark Registration No. 3030306, the registration was invalid and void at the time it was issued.  See Medinol, 67 U.S.P.Q.2d at 1208.  Tokidoki's amendment to the Statement of Use to state the true facts after the validity of its trademark was challenged did not revive the validity of the mark.  Id.

## C.     Trademark Infringement and Unfair Competition Claims Under the Lanham Act

15.     "To succeed on its trademark claims under the Lanham Act, [Tokidoki] must meet three elements: (1) nonfunctionality, (2) distinctiveness and (3) likelihood of confusion."  Talking Rain Beverage Co. Inc. v. South Beach Beverage Co., 349 F.3d 601, 603 (9th Cir. 2003).  "To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, [Tokidoki] must establish that [Fortune] is using a mark confusingly similar to a valid, protectable trademark of [Tokidoki's]."  Brookfield Communications, Inc. v. Entm't Corp., 174 F.3d 1036, 1046 (9th Cir. 1999).  "An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S.

763, 769 (1992).  "Secondary meaning is used generally to indicate that a mark . . . 'has come through use to be uniquely associated with a specific source.'" Id. at 766 n.4.  With its federal registration invalidated, the heart above crossbones mark, by itself (i.e., without the name "tokidoki"), is not protectable as a trademark because:

(a)  it lost any inherent distinctiveness it would have had and became commonplace as a result of widespread use of the same and similar designs in commerce.  An image that is "'so commonplace as to be incapable of creating a separate commercial impression in a buyer's mind'" is incapable of distinguishing the goods of one person from the good of others, and, therefore, is not protectable as a trademark.  Kendall-Jackson Winery v. E. & J. Gallo Winery, 150 F.3d 1042, 1049 (9th Cir. 1998); see also The Federal Glass Co. v. Corning Glass Works, 162 U.S.P.Q. 279, 283-83 (TTAB 1969) (given the many flower designs used on tableware and cookware, the blue "cornflower" design of Corning Glass Works was not inherently distinctive); Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988) (a mark that is "hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'") (abrogated on other grounds), and

(b)  Tokidoki failed to establish that its heart above crossbones mark, by itself (i.e., without the name "tokidoki"), has become distinctive through the acquisition of secondary meaning.

16.    As a commonplace mark in a crowded field, the heart above crossbones mark is weak, see MissWorld (UK), 856 F.2d at 1449, so that Fortune's use of a heart above crossbones design was not likely to cause public confusion.  Furthermore, based on the facts presented at trial, the Court concludes that the factors that the Ninth Circuit identified in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), as being relevant to the determination of likelihood of confusion, weigh in favor of Fortune and against Tokidoki.  "Likelihood of confusion exists when consumers viewing the mark would probably assume that the goods it represents are associated with the source of a different product

identified by a similar mark." KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 608 (9th Cir. 2005).

17.    The Ninth Circuit has identified eight factors relevant to the determination of likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. AMF, 599 F.2d at 348-49 (abrogated on other grounds). "[T]his eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each factor will be case-specific." Brookfield Communications, Inc. v. W. Coast Entertainment Corp., 174 F.3d 1036, 1054 (9th Cir. 1999). The most important factors generally are the similarity of the marks, the relatedness of the goods, and the use of a common marketing channel. GoTo.Com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000). "The factors should not be rigidly weighed . . . ." Dreamwerks Prod. Group, Inc. v. SKG Studio d/b/a Dreamworks SKG, 142 F.3d 1127, 1129 (9th Cir. 1998).

18.    The evidence establishes that, while the marks (without the accompanying reference to "tokidoki") are similar, the goods are not so related or the marketing channels so similar as to be likely to cause confusion. Where the TTAB has found a "sufficient relationship" between shoes and other pieces of clothing "to support a holding of likelihood of confusion," it was "where both sets of goods are sold under the same mark." In re Melville Corp., 18 U.S.P.Q.2d 1386, 1388 (TTAB 1991) (emphasis added). Here, the marks, though similar, are not identical.

19.    In addition, as the Court finds that Tokidoki's survey regarding the likelihood of confusion from Fortune's use of the single heart above crossbones design and the double heart and crossed drumsticks design was materially flawed, the Court concludes that the results of that survey are not credible and deserve little or no weight. See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,

1  Inc., 240 F.3d 832, 840 (9th Cir. 2001) ("In considering what weight to give a

2  survey, the court may consider a variety of factors, including survey design,

3  nature of the questions asked, and the experience and reputation of the surveyor.")

4  **D.    Dilution Claim**

5  20.    "The test for trademark dilution . . . requires the trademark owner to

6  show (1) that its mark is famous; (b) that the junior user has made commercial use

7  of the famous mark; (c) that the junior user began using the mark after it had

8  become famous; and (d) that such use caused actual dilution."  Horphag Research

9  Ltd. v. Garcia, 475 F.3d 1029, 1036 (9th Cir. 2007).  Tokidoki failed to establish

10 that its heart above crossbones mark, by itself, is "famous."  "[T]o meet the

11 'famousness' element of protection under the dilution statutes, 'a mark [must] be

12 truly prominent and renowned.'"  Avery Dennison Corp. v. Sumpton, 189 F.3d

13 868, 875 (9th Cir. Cal. 1999).  The "mark must be a household name."  Thane

14 Int'l v. Trek Bicycle Corp., 305 F.3d 894, 911 (9th Cir. 2002).  "The dilution

15 doctrine is only available to protect distinctive marks as exemplified by such

16 famous names as 'Tiffany,' 'Polaroid,' 'Rolls Royce' and 'Kodak.'"  Sykes

17 Laboratory, Inc. v. Kalvin, 610 F. Supp. 849, 858 (C.D. Cal. 1985).  The heart

18 above crossbones mark lacks the fame possessed by these marks.

   **E.    No Evidence of Lost Sales or Profits**

19 21.    Tokidoki failed to establish that it had suffered any lost sales, lost

20 profits, lost royalties, or any damage to its reputation or goodwill due to the

21 alleged infringement.  Tokidoki's failure to prove actual damages precluded any

22 recovery of Fortune's profits as a measure of Tokidoki's lost profits.  "[D]amages

23 will not be awarded in the absence of credible evidence demonstrating injury to

24 the plaintiff from defendant's sales."  See Lindy Pen Co. v. Bic Pen Corp., 982

25 F.2d 1400, 1408 (9th Cir. 1993).  Likewise, Tokidoki's failure to show that it lost

26 royalties precluded any recovery of reasonable royalties from Fortune.  An award

27 of reasonable royalties must be supported by showing with reasonable certainty

28 that royalties were lost and the amount of that loss.  Trovan, Ltd. v. Pfizer, Inc.,

   2000 WL 709149, *17 (C.D. Cal. 2000).

22.     Due to the absence of evidence that Tokidoki was willing to license the heart and crossbones image, Tokidoki could not show with reasonable certainty that royalties were lost.  Therefore, no basis exists for an award of reasonable royalties.  See id. at *17-*18 (vacating royalty award for lack of evidence that plaintiffs would have been willing to license their trademark).  Here, there was no prior licensing relationship between Tokidoki and Fortune and there was no evidence of an agreement in which Tokidoki had licensed use of only the heart and crossbones design.  Also, Arnold testified that Tokidoki does not license the heart and crossbones by itself.

### F.    Injunctive Relief

23.     Tokidoki did not indicate in the Pretrial Order that it was seeking injunctive relief.  In any event, such a remedy is unwarranted, as Fortune stopped producing and selling shoes bearing heart and crossbones print designs and double heart and crossed drumsticks print designs in 2007 and does not intend to produce shoes bearing those print designs again.  Also, Tokidoki, which never found any need to seek issuance of a temporary restraining order or preliminary injunction, failed to make the showing necessary for a permanent injunction, including evidence that it has suffered an irreparable injury.  See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

### G.    Willful Infringement

24.     Tokidoki still might have been awarded Fortune's profits had it been able to establish that Fortune's alleged infringement was willful.  "Willful infringement may support an award of profits to the plaintiff, but does not require one."  Faberge, Inc. v. Saxony Products, Inc., 605 F.2d 426, 429 (9th Cir. 1979).  Tokidoki failed to carry its burden of proving that Fortune's use of either its single or double heart design constituted willful infringement.  Instead, without knowledge of Tokidoki or its Mark, Fortune independently created its single heart above crossbones design by modifying a star above crossbones design that had been used on a Punkrose brand shoe.  When, after receipt of Tokidoki's cease and desist letter, Fortune shipped shoes with the single heart above crossbones design

to customers whose orders had already been received and accepted, it did not engage in willful infringement, as it was not attempting to cause confusion or to deceive purchasers, but simply to honor prior commitments to its customers.  In Nalpac, Ltd. v. Corning Glass Works, 784 F.2d 752, 754-56 (6th Cir. 1986), the Sixth Circuit found that selling out remaining inventory of allegedly infringing product after infringement lawsuit was filed was not in "bad faith" as defendant was not attempting to exploit the plaintiff's trademark.  As Fortune's double heart and crossed drumsticks design was the product of Fortune's attempt to create a design different from Tokidoki's Mark and thereby avoid infringement, Fortune's alleged infringement was not "willful."  See Roulo v. Russ Berrie & Co., 886 F.2d 931, 942 (7th Cir. 1989) (finding no willful infringement where defendant "made conscious efforts to create elements of dissimilarity, although the dissimilarities were not sufficient").

25.    Tokidoki's contention that Fortune saw, copied, and used Tokidoki's Mark for the purpose of exploiting Tokidoki's popularity was premised solely on unsubstantiated inference.  Tokidoki argued that because Lee, Lutz, and Marcott engage in trend shopping every four to six weeks at various shopping malls and look through fashion magazines to get ideas regarding fashion trends, they must have seen the Tokidoki brand and must have known that it was a "hot brand."  Tokidoki's argument fails to establish willful infringement.

**H.    Copyright Infringement**

26.    "A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  Funky Films, Inc. v. Time Warner Entm't, 462 F.3d 1072, 1076 (9th Cir. 2006).  "Copyright registration is not a prerequisite to a valid copyright, but it is a prerequisite to a suit based on a copyright."  Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1211 (9th Cir. 1998).  The registered work for which Copyright Registration No. VA-1-353-059 was issued was Tokidoki's Fall 2005 catalog and not any individual design. Where an author has retained ownership of a copyright in an individual work, a

non-owner's registration of the compilation that contains the individual work does not register the individual work.  Morris v. Business Concepts, Inc., 259 F.3d 65, 68-69 (2d 2001).  Here, Legno retained ownership of the heart above crossbones design as there was no credible evidence that Legno assigned his interest in the design to Tokidoki.  Thus, Tokidoki's registration of the Fall 2005 catalog did not register the heart above crossbones design.  Assuming, arguendo, that registration of the Fall 2005 catalog conferred registration on the heart above crossbones design, Tokidoki's copyright claim still fails as Fortune did not copy Tokidoki's designs.

27.    "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying.  The burden shifts to the defendant to rebut that presumption through proof of independent creation."  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 486 (9th Cir. 2000).

28.    "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated."  Id. at 482.  Tokidoki failed to establish "access" through evidence of a particular chain of events between the heart above crossbones design and Fortune's access to that work, or through evidence of wide dissemination of its work prior to Fortune's use of the heart above crossbones print design on SODA® shoes in August of 2006.        29.    Tokidoki also did not establish "striking similarity."  "The judicially formulated definition of 'striking similarity' states that 'plaintiffs must demonstrate that such similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source.'"  Selle v. Gibb, 741 F.2d 896, 904 (7th Cir. 1984).  The design, which consists of two relatively commonplace elements – a heart and a crossbones – is sufficiently simple and commonplace that the similarities between Fortune's design and Tokidoki's could easily have been the result of independent

27

1   creation, coincidence, or some theory other than copying.  Tokidoki failed to

2   create a presumption of copying by Fortune.

3      30.    Fortune independently created its single heart above crossbones

4   design without knowledge of its prior existence or of Tokidoki's use.  Fortune

5   also independently created its double heart and crossed drumsticks design by

6   adding an upside-down heart to its previous single heart design and by changing

7   the crossbones in its previous design to crossed drumsticks.  In light of Arnold's

8   testimony that a design with <u>one</u> heart superimposed over crossbones (as opposed

9   to being above the crossbones) is not substantially similar to Tokidoki's heart

10  above crossbones design, Fortune's double heart and crossed drumsticks design

    was not substantially similar to Tokidoki's single heart above crossbones design.

11     **I.   California Unfair Competition and False Advertising Claims**

12     31.    Tokidoki does not have standing to maintain claims for unfair

13  competition under California Business and Professions Code § 17200 and for false

14  advertising under § 17500 as it has not shown injury in fact or loss of "money or

15  property" from Fortune's conduct.  <u>See</u> §§ 17204, 17535; <u>see also</u> <u>Citizens of</u>

16  <u>Humanity, LLC v. Costco Wholesale Corp.</u>, 171 Cal. App. 4th 1, 22 (2009).

17

18                          **III.   CONCLUSION**

19     1.     The Court concludes that Tokidoki failed to carry its burden of proof

20  as to the following factual issues:

21     a)  whether Fortune knew of Tokidoki's Mark/design before Fortune

22  produced shoes bearing the accused print designs;

23     b)  whether Fortune copied Tokidoki's Mark/design;

24     c)  whether Fortune intended to capitalize on Tokidoki's reputation or

    goodwill;

25     d)  whether Fortune intended to deceive or mislead the consuming public

26  into believing that its products and Tokidoki's products were somehow related;

27  and

28

28

e)  whether Fortune's activities in producing the accused products were willful.

2.   With respect to proof of facts that depend primarily or substantially on the testimony of the parties, the credibility of such testimony weighs heavily in favor of Fortune.  Testimony offered by all four officers and employees of Fortune was consistent, uncontradicted, and supported by business records of Fortune that were admitted at trial.  In contrast:

a)  The testimony of Tokidoki members Arnold and Legno lacked credibility because they were contradictory on matters within the knowledge of Arnold and Legno;

b)  Tokidoki falsely represented to Fortune and this Court that the work registered as Reg. No. VA-1-353-059 was the heart and crossbones design, when it was actually Tokidoki's Fall 2005 catalog;

c)  Tokidoki presented evidence lacking in credibility regarding the purported written transfer of Legno's rights in the heart and crossbones image to Tokidoki; and

d)  Tokidoki misrepresented to the USPTO that it was using the heart above crossbones mark in commerce on more than 20 products in Class 025 on which the mark was <u>not</u> being used.

3.   Even if the Court were to assume that Tokidoki's circumstantial evidence was sufficient to create an inference of access, the Court finds that Fortune carried the burden of establishing, through persuasive and consistent testimonial and documentary evidence, the independent creation of its single heart and crossbones print design and its double heart and crossed drumsticks print design. This evidence includes, but is not limited to, the testimony of Carol Lee and other Fortune officers and employees regarding the inspiration of the Punkrose shoe, the log showing Lee's August 7, 2005 purchase of the Punkrose shoe, the SR-Form sent to Fortune's manufacturer, and the Punkrose shoe itself. Tokidoki produced no evidence that contradicts this evidence.

29

THEREFORE, the Court concludes that Tokidoki failed to prove any of its claims by a preponderance of the evidence.  The Court finds in favor of Fortune and against Tokidoki on each of Tokidoki's claims.  The Court also concludes that Fortune carried its burden of proving Tokidoki's fraud in the procurement of Trademark Registration No. 3030306 and therefore this trademark registration is ordered cancelled.

7/28/09

Dated: _____

_____
Dale S. Fischer
United States District Judge